1

2

3

4

5

6

7                    IN THE UNITED STATES DISTRICT COURT

8                  FOR THE NORTHERN DISTRICT OF CALIFORNIA

9

10   YOLANDA MITCHELL,                    No C 04-3135 VRW
                                          No C 04-3301 VRW
11              Plaintiff,

12        v                                    ORDER

13   SUPERIOR COURT OF CALIFORNIA,
     COUNTY OF SAN MATEO, a judicial
14   branch entity,

15              Defendant.
     _____
16

17   IRMA TOLENTINO,

18              Plaintiff,

19        v
     SUPERIOR COURT OF CALIFORNIA,
20   COUNTY OF SAN MATEO, a judicial
     branch entity,
21
                Defendant.
22   _____/

23             Defendant Superior Court of the State of California, in

24   and for County of San Mateo (Superior Court) has moved for summary

25   judgment in its favor on all claims in these two consolidated

26   actions.  C 04-3135 Doc #35 and 04-3301 Doc #32.  The actions are

27   consolidated by stipulation pursuant to Rule 42(a) of the Federal

28   Rules of Civil Procedure.  C 04-3135 Doc #22 and C 04-3301 Doc #20.

*United States District Court*
*For the Northern District of California*

**United States District Court**
For the Northern District of California

Plantiffs Yolanda Miller and Irma Tolentino were co-supervisors formerly employed by Superior Court.  In these actions, they allege that their terminations were motivated by unlawful discrimination in violation of Title VII of the Civil Rights Act of 1964, 42 USC § 2000e <u>et seq</u>.  In addition, both Mitchell and Tolentino allege retaliation, defamation and intentional infliction of emotional distress (IIED).

For the reasons stated herein, the court GRANTS Superior Court's motions for summary judgment in each of these consolidated actions.

I

As a preliminary matter, Superior Court has filed objections (C 04-3301 Doc #48) to the declaration (C 04-3301 Doc #38) and supplemental declaration (C 04-3301 Doc #47) of Tolentino submitted in opposition to Superior Court's motion to dismiss. Superior Court objects that some statements in Tolentino's initial declaration vary materially from Tolentino's deposition testimony and that some of those same statements lack any foundation establishing personal knowledge.

Tolentino's supplemental declaration purports to explain the discrepancies between her deposition and declaration testimony based on having consulted "notes" in the interim that she had not consulted prior to the deposition.  To this argument, Superior Court counters that the notes were not —— but should have been —— disclosed in response to a March 25, 2005 document request that sought, <u>inter alia</u>, "[a]ll diaries, calendars, notes or other memoranda or documents kept by plaintiff which relate * * * to any

**United States District Court**

For the Northern District of California

of the allegations contained in the Complaint or to events occurring during Plaintiff's employment with the Superior Court."  Wiley Decl, C 04-3301 Doc #49 Ex A at 3.

In response, Tolentino submits a declaration by her current counsel, John Kelley, reciting difficulties obtaining a complete and orderly hand-over of documents and files from Tolentino's prior counsel, Stephine Wells.  Kelly Decl, C 04-3301 Doc #51.  That declaration attaches a letter dated November 11, 2005 from Superior Court's counsel refusing Tolentino's request for a copy of the documents she had previously disclosed to Superior Court, citing attorney time and cost and that "it does not appear that Plaintiff has taken any action against her former counsel to enforce that counsel's obligation to provide complete files to your firm."  Id Ex 2.  The Kelley declaration admits, however, that Superior Court's counsel had alerted him at Tolentino's August 2005 deposition to missing documents in the document production (¶ 8) and that on December 20, 2005, he visited the offices of prior counsel and obtained a complete set of all case documents, including those Superior Court's counsel had told him were missing (¶¶ 11-12).  It appears that Tolentino's counsel, once satisfied that he had obtained all documents, took no steps to supplement or simply re-do the incomplete document production in order to rectify the errors of former counsel and give Superior Court a fair opportunity to view Tolentino's evidence as the discovery rules require.  Id.

Superior Court properly relies on <u>Cleveland v Policy Management Systems Corp</u>, 526 US 795, 806 (1999), which noted that "with virtual unanimity" courts have held that statements in a declaration submitted in opposition to a motion for summary judgment

United States District Court

For the Northern District of California

may not contradict prior testimony without explaining the contradiction or attempting to resolve the disparity.  Tolentino's attempt to avoid responsibility for her inconsistent statements by blaming the attorneys who no longer represent her is unavailing. The federal discovery rules and the state rules governing attorney conduct are designed, respectively, as relevant here, to ensure complete, early disclosure of relevant evidence and to prevent the loss of, or inadvertent failure to disclose, such evidence in the event of a change of counsel.  FRCP 26(a)(1)(B) (requiring initial disclosure of all documents "that the disclosing party may use to support its claims or defenses"); California Rule of Conduct 3-700(D) (requiring prompt release to client by withdrawing counsel of "all client papers and property").  Superior Court is entitled to the protection of those rules.  Moreover, Tolentino's new counsel was made aware in August 2005 of gaps in the document disclosure, yet declined to err on the side of caution by making the complete set of documents available to Superior Court upon obtaining them in December 2005.  For these reasons, Superior Court's objections to pages 10:16-18, 11:1-3, 13:19-25 and 19:8-24 of the initial Tolentino declaration and 2:11-18, 2:24-28, 3:1-4, 3:11-21 are SUSTAINED.

    Furthermore, Superior Court correctly points out that Tolentino's attempt, in her supplemental declaration, to cure the manifest lack of foundation for statements regarding the job performance of other court employees made at page 18, paragraph 54 of her initial declaration, is ineffectual.  The statements continue to lack foundation and do not constitute probative evidence relevant \\

**4**

to any issue in these motions.  The objections to pages 4:1-28 and 5:1-10 of the supplemental declaration are therefore SUSTAINED.

II

A

The following unified factual chronology sets forth events relevant to the motions in both cases.  Although some portions are relevant only to one motion or the other, a single chronology favors the interests of clarity and economy.

Mitchell was employed by Superior Court from 1984 until her termination effective February 20, 2004.  Complaint ¶¶ 4, 9 (C 04-3135 Doc #1).  Her last position was court services co-supervisor (together with Tolentino) for the criminal division of the court's North County branch.  Complaint ¶ 4.  Peggy Thompson, then Court Administrator for the Municipal Court of the County of San Mateo, approved Mitchell's promotion to supervisor in 1990.  Thompson Decl at 1:20-21, 25-27 (C 04-3135 Doc #36 Att #6).  Before the events of 2003 that culminated in Mitchell's termination in February 2004, Mitchell had been subject to two prior disciplinary actions:  a three-day suspension for misconduct in February 2000 and a proposed ten-day suspension in 2003 for reasons including dishonesty, insubordination and misuse of position.  The latter was never carried out due to intervening events.  Mitchell Depo 165:7-25, 166:1-24 (C 04-3135 Doc #35 Att #1 Ex A); Thompson Depo 64:10-18 - 65:3-7 & Ex 9 (C 04-3135 Doc #35 Att #1 Ex B.

Tolentino was employed by Superior Court from 1988 until her termination effective February 20, 2004.  Complaint ¶ 9, C 04-3301 Doc #1.  She last served as court services co-supervisor,

5

together with Mitchell, for the criminal division of the North County branch.  Complaint ¶ 8.  Peggy Thompson approved Tolentino's promotion to supervisor in 1991.  Thompson Decl at 1:20-21, 25-27, C 04-3301 Doc #32, Att 6.

In the spring of 2003, Superior Court undertook a hiring process to fill deputy clerk positions.  One of the applicants was a personal acquaintance of Mitchell's, one Marvin Warren, who was not offered the job despite Mitchell's efforts.  On May 21, 2003, Mitchell filed an EEO complaint against Thompson, who by then had been promoted to Court Executive Officer, and Deputy Court Executive Officer Rodina Catalano alleging "harassment, retaliation, disparate treatment and discrimination against Yolanda Mitchell."  Mitchell Decl at 4 & Ex 1, 04-3135 Doc # 42.  That complaint set forth a detailed narrative of the course of the recruitment process that had resulted in two candidates other than Warren being selected.  Among the specific grievances expressed in Mitchell's EEO letter were: (1) Mitchell had received second-hand information that Catalano had told another manager that Mitchell had intentionally maintained a backlog "to justify getting positions" and (2) Mitchell's various disagreements and conflicts with her superiors about the hiring process for the deputy clerk positions.  Mitchell did not refer to Warren by name or include any specifics about him, nor did she assert that Superior Court's failure to select him was due to racial bias.  On the last page of this letter, Mitchell wrote: "During my course of employment with the courts under the leadership of Ms Peggy Thompson, I have experienced many forms of harassment, disparate treatment, retaliation, discrimination by management.  I have filed complaints with the EEOC & FE&H and feel that because I

6

**United States District Court**
For the Northern District of California

have filed with these agencies I am continually experiencing these forms of harassment."  Id at 5.

The next day, May 22, 2003, Mitchell sent her immediate supervisor, Court Services Manager Iracema Carranza, a memorandum complaining that she and Tolentino were not included in the recruitment process.  Mitchell Decl ¶ 4 and Ex B.  The memorandum noted that Mitchell and Tolentino had met with Carranza already to discuss the matter.  Id.  It did not mention any candidate, directly or indirectly, and did not allege racial or other bias in the selection of the candidates hired.

On June 19, 2003, Mitchell filed a Charge of Discrimination with the California Department of Fair Employment and Housing (DFEH).  Mitchell Decl ¶ 5 and Ex C.  In that document, Mitchell wrote, among other things, "I complained on or about May 17, 2003 to Court Services Manager Nicole McKay and Ms Catalano that a particular applicant was not hired because he is a Baptist pastor, is over the age of 40 and an African-American male." She also complained that she was not "allowed to hire any applicant" and that Thompson and Catalano "have also stopped communicating with me." Id.  In closing, Mitchell's DFEH charge stated "I believe that I have been discriminated against on the basis of my race, African-American * * *.  I have also been retaliated against for engaging in protected activity in violation of the Age Discrimination in Employment Act * * * and the Civil Rights Act of 1964."  Id.

Superior Court retained an outside consultant, Gail Schino, to conduct an investigation into Mitchell's conduct in connection with the recruitment process.  Thompson Depo at 36-37, C 04-3135 Doc #41 Ex 1; Catalano Depo at 79-81, C 04-3135 Doc #41 Ex

7

2.   Superior Court decided to hire an outside investigator "because there had been a EEO complaint filed that was being investigated by the county."  Thompson Depo at 38.

At a July 2003 pre-termination hearing for Dorothy Faalau, one of Mitchell's and Tolentino's subordinate employees who had been notified of her proposed termination, court management heard a number of allegations about Mitchell and Tolentino as supervisors in the criminal division.  Thompson Depo 32:12-24, 33:2-11, C 04-3135 Doc #35 Att #1 Ex B.  Although similar allegations had been raised in the past, prior attempts to investigate had been unsuccessful because employees were unwilling to come forward for fear of retaliation by Mitchell and Tolentino.  Id at 51:19-23, 52:5-25, 53:1-10, 54:9-25, 55:1-25, 56:1-11.  Because of this past experience and the gravity of the new allegations, Thompson authorized Superior Court to hire an outside employment law firm to conduct an independent investigation of the allegations against Mitchell and Tolentino.  Id at 45:5-8, 48:25, 49:1-25, 50:1.

On August 4, 2003, following the completion of the Schino investigation, Carranza sent Mitchell a six-page letter styled as a notice of intent to "issue you a non-punitive disciplinary letter that equates to a 10-day suspension."  The letter listed dishonesty, insubordination, disrespectful or discourteous conduct, misuse of position, failure to follow policies, procedures or work rules or negligence in the performance of duties and violations of code of ethics tenets requiring personal integrity, professionalism and the safeguarding of confidential information.  Thompson Depo Ex 9, C 04-3135 #35 Att #1 Ex B.

\\

**United States District Court**
For the Northern District of California

Most of the August 4 letter expressed displeasure with Mitchell's conduct as a voluntary participant in the recruitment panel for the deputy court clerk position. It focused on (1) Mitchell's alleged failure to disclose critical facts about her relationship with candidate Warren, who was the pastor of the church at which she served on the board of trustees and had listed Mitchell as a reference, (2) her alleged disclosure of confidential information about the hiring process to the applicant —— specifically, that the panel did not plan to hire him because it had not received responses from his references, and (3) her failure to comply with a direct order not to solicit specific information from other supervisors about the candidates they had chosen. Id. The letter concluded: "I believe that on several occasions as these events unfolded, you failed to meet the expectations of a Court Services Supervisor." Id. The suspension was never carried out, apparently due to the intervening investigation prompted by the Faalau disclosures. Thompson Depo at 64:10-18, 65:3-7, C 04-3135 Doc #35 Att #1, Ex B).

Meanwhile, Superior Court hired Richard Curiale, a partner with a San Francisco-based employment law firm, to investigate the allegations of misconduct that had arisen in the Faalau hearing. Curiale interviewed nineteen witnesses over the five-week period from August 27 to October 3, including long-term Superior Court employees as well as recently-hired and former employees in Mitchell's and Tolentino's department. The witness group also included management representatives, human resources personnel and a union representative. Curiale Depo 29:12-25, 30:18-25, 31:1-12 & Exs 2 and 3 at 2, C 04-3135 #35 Att #1 Ex C. After completing his

United States District Court
For the Northern District of California

interviews, Curiale drafted detailed investigation reports summarizing witness interviews and setting forth his findings regarding the Mitchell's and Tolentino's performance as co-supervisors.

At some point before October 11 during the pendency of the Curiale investigation, Mitchell was directed to work at home. E g, Catalano Depo at 121, 107, 109 (C 04-3135 Doc # 41 Ex 2).

Curiale's report regarding Mitchell, dated November 3, 2003, ran to fourteen single-spaced pages and included numerous direct quotations from the witness interviews. Curiale Depo Ex 3, C 04-3135 Doc #35 Att #1 Ex C. Specific and detailed, it amounted to a scathing review of Mitchell's performance in her position. The report recited that Curiale had told Mitchell she did not have to answer any question and was free to leave at any time, but that he "stressed to Mitchell that it was important that she be truthful in the interview [and] that being untruthful could result in her termination." Id at 4. The report related that Mitchell was nonetheless untruthful in the interview: "[o]ne of the most disturbing things I found in my interview with Mitchell was her willingness to misrepresent the truth when we discussed any issue which she found uncomfortable or threatening." Id at 5. Such issues were, according to the report, numerous.

The Curiale report described finding a consensus that Mitchell "managed by fear" by targeting employees who questioned her, used demeaning language toward co-workers and subordinates and attempted to undermine senior management and foster division by strongly urging people to file union grievances and EEO complaints. Id at 3. The report also made particular note of Mitchell's

practice of sending employees out from the court to buy food and asking them to spend time during the workday cooking, apparently to provide her with foods that she desired.  Two anonymous quotations from interviewees are illustrative:

> Food is important to Yolanda.  If she wants to eat cake during the day, she has people bake a cake.  During work time, she sends people to Costco or Albertsons to get food.
>
> Food is an outlet for Yolanda.  Some people spend the whole morning cooking and shopping.

Id at 8.

The concluding paragraph summarized the report's findings:

> Mitchell has regularly and consistently engaged in conduct which would reasonably be expected to violate her obligation as a supervisor to create a workplace environment which is conducive to employees feeling free to bring to management's attention problems or concerns they have regarding their treatment or which would reasonably cause them to feel that they are being treated in less than a professional matter and with little courtesy, dignity and respect.  In addition, she has created an environment which engenders fractionalism [sic] and mistrust and has consistently abused her position as a supervisor by having employees cook and/or leave the premises to get food during working hours.  Finally, * * * Mitchell knowingly and consistently misrepresented the truth to me in this investigation [although] she was clearly advised on the potential consequences of doing so.

Id.

Curiale's report on Tolentino, dated November 4, 2003, concluded that even though she and Mitchell were nominally peers, Tolentino was "completely deferential" to Mitchell, would "never disagree with Mitchell or challenge her in any way" and, moreover, conveyed all information received from subordinates directly to Mitchell.  Curiale Depo Ex 2, C 04-3301 Doc #32 Att #1 Ex C.  Thus,

United States District Court
For the Northern District of California

**United States District Court**
For the Northern District of California

an employee who approached Tolentino about unwanted attention from a co-worker "in confidence," stating that she was not comfortable telling Mitchell, soon found herself angrily confronted by Mitchell. Id at 3.  The seven-page report concluded that Tolentino "has regularly and consistently engaged in conduct which would reasonably be expected to violate her obligation as a supervisor to create a work environment wherein employees feel free to raise issues and concerns" and that she "ratified" Mitchell's "indefensible behavior."  Id at 6-7.  Curiale also found that Tolentino's unqualified endorsement of an abusive lower-level manager that the interviewees had unanimously condemned established "just how divorced [she] is from the reality that is her department."  Id.

After receiving Curiale's reports, Catalano conducted follow-up interviews with certain of the witnesses as part of Superior Court's internal investigation into Faalau's allegations. Catalano Depo 115:18-22, 116:4-20, C 04-3135 #35 Att #1 Ex D.

On December 19, a letter was hand-delivered to Tolentino from Catalano directing her to work at home "pending the outcome of the disciplinary action proposed against you."  Tolentino Decl Ex 26, C 04-3301 Doc #38.  It directed her to remain at her home during work hours and "not to appear at or call the Court and not to access the computer system while on this temporary assignment without receiving advance permission from [Catalano]."  A second letter by Catalano of the same date was also hand-delivered to Tolentino. That letter, which ran to over six single-spaced pages, began: "Please take notice that it is the intent of this office to dismiss you from your position of Court Services Supervisor effective January 9, 2004."  Tolentino Decl Ex 27, C 04-3301 Doc #38.

12

**United States District Court**
For the Northern District of California

The court assumes that Superior Court delivered a similar notice-of-intent-to-terminate letter to Mitchell on the same date, although it appears that neither party included this letter in the record.

On January 27, 2004, Mitchell and Tolentino, together with their union representatives, met with a hearing officer and responded to the charges set forth in the notice-of-termination letters. Mitchell Depo Ex 17 (C 04-3135 Doc #35 Att 1 Ex A); Tolentino Depo Ex 17 (C 04-3301 Doc #32 Att 1 Ex A).

On February 19, 2004, Thompson issued separate termination letters to Mitchell and Tolentino. Thompson Depo 69:5-22, 70:1-4 & Ex A, C 04-3135 #35 Att #1 Ex B, Mitchell Depo Ex 17, C 04-3135 #35 Att #1 Ex A. In the letter to Mitchell, which ran to eleven single-spaced pages, Thompson recited the grounds for termination: dishonesty; unacceptable performance; willful misconduct causing damage to public property; disrespectful or discourteous conduct and sexual harassment and/or discrimination toward a county officer or official, another employee or a member of the public; and misuse of position and violations of seven of the tenets of the code of ethics for California court employees. Mitchell Depo Ex 17 at 1.

Specific bases for termination set forth in the termination letter to Mitchell included: regularly sending employees to purchase food for meals or snacks and cooking and preparing food on court time; being untruthful during the interview with Curiale; undermining management; advising employees to go to the union or file charges with EEOC so that "someone would get fired"; making derogatory and untruthful comments about Catalano such as that Catalano "hates us" and "is not very smart";

United States District Court
For the Northern District of California

intentionally allowing work to pile up in order to create a backlog to justify hiring more staff; encouraging Faalau's spouse to go to the union regarding Faalau's adverse employment action, asserting that "[w]e're all backing her up" even though the proposed dismissal was in fact based on Mitchell's negative assessments of Faalau's performance; making inappropriate and insulting comments to and about subordinate employees; making inappropriate and insulting comments to a woman who was pregnant, thus providing grounds for a formal complaint with EEOC or DFEH; sexually harassing and discriminating against a subordinate by making jokes and inappropriate comments regarding sexual orientation; neglecting her duty as a supervisor by failing to respond appropriately to a complaint from an employee regarding sexual harassment; misusing her position and authority by requesting that staff bring her gifts and food; intimidating and "targeting" employees who questioned her, her co-supervisor or her deputies; failing to supervise adequately two of the deputies under her supervision by failing to address performance deficiencies and/or workplace misconduct; giving fundamentally inaccurate information about Faalau to court management, prompting management to initiate termination proceedings; being insubordinate and disrespectful toward her manager, Irasema Carranza, and toward human resources personnel who attempted to contact her about leaves of absence.  Id.

Interlineated with the specific accusations were summaries of Mitchell's responses to the charges at her Skelly hearing and Thompson's comments on those responses, highlighting factual issues about which Mitchell had changed her story between speaking to Curiale and addressing the hearing officer and/or offered

United States District Court

For the Northern District of California

explanations that were irrelevant or incomplete.  The letter did not find that Mitchell had satisfactorily addressed any of the nineteen specific allegations that were presented as bases for her proposed termination.  In conclusion, the letter noted Mitchell's nearly twenty years of experience with Superior Court stressing that she had received considerable training and coaching and understood the expectations of a supervisor.  It stated:

> I find your actions to be egregious, extremely serious and injurious to the Court and the employees under your supervision. This is not a case of an act of minor misconduct. Nor is it a case of an isolated incident of misconduct. Rather, employees reported an ongoing pattern of repeated harassment, intimidation and other behaviors that had a severe impact on their morale and ability to perform successfully. * * * Staff consistently described an atmosphere of supervisor against employee where you and your co-supervisor "ganged up on" employees.

Id at 11.  The letter also quoted Mitchell's response to the hearing officer when asked what she would do differently if she went back: "Nothing, I thought things were fine," which Thompson stated "shows that you are completely out of touch with what is appropriate conduct and performance."  Id.  The letter notified Mitchell that she was dismissed from her position effective February 20, 2004.

The letter to Tolentino, also dated February 19, 2004, ran to nine single-spaced pages.  Tolentino Depo Ex 15, C 04-3301 Doc #32 Att #1 Ex A.  It gave as grounds for termination:  dishonesty; unacceptable performance; willful misconduct causing damage to public property or waste of public supplies or time; disrespectful or discourteous conduct toward a county officer or official, another employee or a member of the public; and violations of three tenets of the code of ethics for California court employees —— those

15

concerning impartial and evenhanded treatment of all persons, personal integrity and treating others with respect and courtesy. Id at 1.  The letter expanded on the Catalano letter by discussing and addressing relevant information obtained at Tolentino's Skelly hearing.  As with the letter to Mitchell, Thompson's letter highlighted inconsistent statements Tolentino had made to Curiale, Catalano and/or the hearing officer at the Skelly hearing.  For example, regarding Tolentino's responses to the allegation that she had condoned employees' shopping for food and cooking during business hours, Thompson wrote that Tolentino had told the hearing officer that she did not know that the employees used court time for this purpose because she allowed them to combine breaks and did not keep track of their time, then added:

> This statement is contrary to what you told the investigator which was that you knew the employees went on Court time and that you knew it was wrong. Your statement to the Hearing Officer constitutes further dishonesty. * * *

Id at 2.  The concluding section of the letter drew particular attention to Tolentino's statements that she did not understand what she had done wrong and that she viewed the office "to be one big happy family" and that she seemed unaware that Mitchell had done anything inappropriate.  Id at 8.  The letter notified Tolentino that she was dismissed from her position effective February 20, 2004.

On August 4, 2004, Mitchell filed her complaint initiating this action.  On August 13, 2004, Tolentino followed suit.  Superior Court moves for summary judgment in its favor on all causes of action in both cases.

\\

United States District Court

For the Northern District of California

**United States District Court**

For the Northern District of California

**III**

**A**

A principal purpose of summary judgment is to isolate and dispose of factually unsupported claims. <u>Celotex Corp v Catrett</u>, 477 US 317, 323-24 (1986). A party moving for summary judgment who does not have the ultimate burden of persuasion at trial (here, Superior Court) has the initial burden of producing evidence negating an essential element of the non-moving party's claims or showing that the non-moving party does not have enough evidence of an essential element to carry its ultimate burden of persuasion at trial. <u>Nissan Fire & Marine Insurance Co v Fritz Cos</u>, 210 F3d 1099, 1103 (9th Cir 2000). Where the party moving for summary judgment would bear the burden of proof at trial (here, the plaintiffs), it has the initial burden of producing evidence which would entitle it to a directed verdict if the evidence went uncontroverted at trial. <u>CAR Transportation Brokerage Co, Inc v Darden</u>, 213 F3d 474, 480 (9th Cir 2000).

If the moving party does not satisfy its initial burden, the non-moving party has no obligation to produce anything and summary judgment must be denied. If, on the other hand, the moving party does satisfy its initial burden of production, then the non-moving party may not rest upon mere allegations or denials of the adverse party's evidence, but instead must produce admissible evidence that shows there is a genuine issue of material fact for trial. <u>Nissan Fire & Marine Insurance Co</u>, 210 F3d at 1102. A genuine issue of fact is one that could reasonably be resolved in favor of either party. A dispute is "material" only if it could

\\

17

affect the outcome of the suit under the applicable law.  <u>Anderson v Liberty Lobby, Inc</u>, 477 US 242, 248-49 (1986).

B

Title VII prohibits covered employers from discriminating against a protected individual based on race, color, religion, sex or national origin.  42 USC § 2000e-2(a)-(d).  In a Title VII case, the plaintiff carries both the initial burden of establishing a prima facie case and the ultimate burden of proving discrimination.  <u>St Mary's Honor Center v Hicks</u>, 509 US 502, 506-07 (1993).  Under the allocation of the burden of production and the order for the presentation of proof established by the Supreme Court for discriminatory-treatment cases, a plaintiff must first establish, by a preponderance of the evidence, a "prima facie" case of discrimination.  Id.  "The ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff."  <u>Texas Department of Community Affairs v Burdine</u>, 450 US 248, 253 (1981).

If a plaintiff is unable to adduce direct evidence of discriminatory motive, she may make out a prima facie case of discrimination by establishing: (1) plaintiff was a member of a protected class; (2) plaintiff was competently performing in the position held —— that is, satisfying the employer's legitimate expectations; (3) plaintiff suffered an adverse employment action (refusal to hire or promote, demotion, discharge, etc); and (4) the adverse action occurred under circumstances suggesting a discriminatory motive, such as that employees outside the protected class received better treatment.  M Chin, D Cathcart, A Exelrod & R

18

**United States District Court**
For the Northern District of California

Wiseman, <u>California Practice Guide:  Employment Litigation</u> ¶ 7:392 (The Rutter Group 2005).  An employee's subjective personal judgments of her competence alone do not raise a genuine issue of material fact.  <u>Schuler v Chronicle Broadcasting Co, Inc</u>, 793 F2d 1010, 1011 (9th Cir 1986).  The burden of establishing a prima facie case is "minimal," requiring only that the evidence give rise to an inference of unlawful discrimination.  Chin, et al, <u>Employment Litigation</u> ¶ 7:393.

Once the plaintiff establishes a prima facie case, the burden shifts to the defendant to produce evidence of a non-discriminatory reason for its adverse employment decision.  Id; <u>St Mary's Honor Center</u>, 509 US at 509.  This burden, like the prima facie case, is not onerous.  Chin et al, <u>Employment Litigation</u> ¶ 7:416.  The determination that the employer has met its burden of production (and thus rebutted any presumption of discrimination) involves no credibility assessment.  Id.  Because the ultimate issue is whether the employer had a discriminatory motive, the employer's reasons, if nondiscriminatory on their face, may preclude a finding of discrimination even if they are "foolish or trivial or even baseless."  <u>Villiarimo v Aloha Island Air, Inc</u>, 281 F3d 1054, 1063 (9th Cir 2002).

The employer's proof of legitimate, nondiscriminatory reasons for its action dispels the inference of discrimination raised by plaintiff's prima facie case, leaving plaintiff with the ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against her.  Plaintiff may do so by proving that the legitimate reasons offered by the employer were false, creating an inference that those reasons were merely a

pretext and that the true reason for the adverse action was intentional discrimination. <u>Reeves v Sanderson Plumbing Products, Inc</u>, 530 US 133, 142 (2000).

On a summary judgment motion by the employer, plaintiff must create a genuine issue of material fact by adducing (1) evidence that the nondiscriminatory reasons given by the employer are factually untrue; and (2) evidence in support of the prima facie case. <u>Reeves</u>, 530 US at 148. A plaintiff may either meet the burden to show pretext using either direct or circumstantial evidence. Direct evidence typically consists of clearly sexist, racist or similarly discriminatory statements or actions by the employer. <u>Godwin v Hunt Wesson, Inc</u>, 150 F3d 1217, 1221 (9th Cir 1998)(supervisor stated he "did not want to deal with a female"). Circumstantial evidence is that which requires an additional inferential step to demonstrate discrimination and may take one of two forms: (1) it can make an affirmative case of employer bias, such as through statistical evidence pointing to bias; or (2) establishing that the proffered explanation for the adverse action is unworthy of credence. <u>Coghlan v American Seafoods Co, LLC</u>, 413 F3d 1090, 1095 (9th Cir 2005). As the Ninth Circuit explained in <u>Coghlan</u>,

> The distinction between direct and circumstantial evidence is crucial, because it controls the amount of evidence that the plaintiff must present in order to defeat the employer's motion for summary judgment. * * * [W]hen the plaintiff relies on circumstantial evidence, that evidence must be "specific and substantial" to defeat the employer's motion for summary judgment.

Id.

\\

United States District Court
For the Northern District of California

United States District Court
For the Northern District of California

Defendant Superior Court seeks to invoke the "same-actor" doctrine, which provides that "where the same actor is responsible for both hiring and firing of a discrimination plaintiff, and both actions occur within a short period of time, a strong inference arises that there was no discriminatory action" and summary judgment is appropriate for the employer on this ground alone.  Bradley v Harcourt Brace & Co, 104 F3d 267, 270-71 (9th Cir 1996).  More specifically, the same-actor doctrine acknowledges that "an individual who is willing to hire and promote a person of a certain class is unlikely to fire them [sic] simply because they [sic] are a member of that class."  Id at 271, quoting Buhrmaster v Overnite Transportation Co, 61 F3d 461, 464 (6th Cir 1995).  The Ninth Circuit has since suggested that the same-actor inference need not be limited to cases in which the favorable and the adverse employment actions took place "within a short period of time" per Bradley, finding, for example, a three-year lapse of time no bar to application of the inference.  Coghlan, 413 F3d at 1097.

B

To establish a prima facie case for retaliation under Title VII, plaintiff must establish that (1) she engaged in a protected activity; (2) the employer subjected plaintiff to an adverse employment action; and (3) a causal link exists between the protected activity and the employer's action.  Passantino v Johnson & Johnson Consumer Products, Inc, 212 F3d 493, 506 (9th Cir 2000).  If a prima facie case has been established, the employer must articulate a legitimate, non-retaliatory reason for the action taken.  Stegall v Citadel Broadcasting Co, 350 F3d 1061, 1066 (9th

United States District Court

For the Northern District of California

Cir 2003).  Next, plaintiff must prove the employer's reason is a pretext.  Id.

Although neither Mitchell nor Tolentino cites 42 USC 2000e-3(a) or otherwise clearly articulate the legal basis for their retaliation claim, it appears that they seek to establish that their firings were because they "opposed [a] practice made an unlawful employment practice made unlawful by [Title VII]," or "made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under [Title VII]."  42 USC § 2000e-3(a).  They appear to be arguing that their complaints and/or comments to Catalano and others about the hiring process that resulted in candidates other than Reverend Warren being selected amounted to such "opposition."  A "causal link" may be established by an inference from circumstantial evidence such as the employer's knowledge that the employee engaged in protected activity and a proximity in time between the protected action and the allegedly retaliatory employment decision.  See, e g, Jordan v Clark, 847 F2d 1368, 1376 (9th Cir 1988).  Such proximity must, however, be "very close."  Clark County School District v Breeden, 532 US 268, 273 (2001).

C

In order to establish a claim for defamation, a plaintiff must prove the following essential elements:  (1) false non-privileged publication of a statement of fact that exposes plaintiff to hatred, contempt, ridicule, or obloquy, or which causes him to be shunned or avoided or has a tendency to injure him in his occupation or charges plaintiff with a crime, loathsome disease, impotence or

22

United States District Court

For the Northern District of California

want of chastity or tends directly to injure him in his occupation;
(2) actual damage to plaintiff's reputation; and (3) causation.  Cal
Civil Code §§ 44-46; see <u>Gregory v McDonnell Douglas Corp</u>, 17 Cal 3d
596, 600 (1976).

        Communications made in the personnel management context
are generally privileged under California Civil Code § 47(c), which
provides in relevant part that a privileged publication is one made:

> (c) In a communication, without malice, to a
> person interested therein, (1) by one who is also
> interested, or (2) by one who stands in such a
> relation to the person interested as to afford a
> reasonable ground for supposing the motive for
> the communication to be innocent, or (3) who is
> requested by the person interested to give the
> information.

See <u>Kacludis v GTE Sprint Communications Corp</u>, 806 F Supp 866, 872
(N D Cal 1992)(Conti, J)(internal communications about an employee's
performance presumed to be privileged under § 47(c) absent pleading
of specific facts to defeat the privilege).


                                  D

        As for plaintiffs' claim for intentional infliction of
emotional distress, they must allege: (1) "extreme and outrageous
conduct by the defendant with the intention of causing, or reckless
disregard of the probability of causing, emotional distress;" (2)
that plaintiff[s] suffered "severe or extreme" emotional distress;
and (3) causation.  <u>Christensen v Superior Court</u>, 54 Cal 3d 868,
903 (1991).  In order to be "outrageous," conduct "must be so
extreme as to exceed all bounds of that usually tolerated in a
civilized community."  Id.  Further, "[i]t is not enough that the
conduct be intentional and outrageous.  It must be conduct directed

23

United States District Court
For the Northern District of California

at the plaintiff, or occur in the presence of a plaintiff of whom the defendant is aware."  Id.  "The only exception to this rule is that recognized when the defendant is aware, but acts with reckless disregard, of the plaintiff and the probability that his or her conduct will cause severe emotional distress to that plaintiff." Id. "Where reckless disregard of the plaintiff's interests is the theory of recovery, the presence of the plaintiff at the time the outrageous conduct occurs * * * justifies recovery * * *."  Id at 906.

From this point on, the motions in the Mitchell and Tolentino cases will be addressed separately.


IV

A

Mitchell claims both race and national origin discrimination.  Since she testified at deposition that she was born in the United States, her national-origin theory is essentially identical to her race theory.  Mitchell Depo, C-04-3135 Doc # 35-1 Ex A at 241-42.  While Mitchell has satisfied prongs one and three of the prima facie case, she has not met the second and fourth prongs.  The record contains abundant evidence that her performance as supervisor was not satisfactory.  The Thompson deposition makes clear that concerns about the management of Mitchell's department predated the events that led Thompson to hire Curiale to investigate.  The Curiale investigation confirmed previous reports that employees in the department were not being treated well and the department was mismanaged.  As regards the fourth prong, Mitchell has failed to adduce evidence suggesting that the adverse action

24

United States District Court
For the Northern District of California

against her was motivated by discriminatory intent.  She admitted at deposition that no one ever made racially discriminatory remarks to her and she has failed to introduce, as she must in response to Superior Court's summary judgment motion, admissible circumstantial evidence of discriminatory motive.

Had Mitchell been able to establish a prima facie case of race discrimination, however, she would nonetheless be unable to overcome Superior Court's legitimate, non-discriminatory reasons for firing her.  This Title VII case stands out because the employer is able to adduce in support of its summary judgment motion a body of extraordinarily persuasive, detailed evidence that the adverse action against the employee was justified and that discrimination was not the employer's motive.  Mitchell contends that the Curiale report is a pretext for her termination by, in essence, nit-picking the details of the report by faulting Curiale for failing to interview some employees and stating that it contained "numerous blatant errors."  Mitchell memo at 21, C 04-3135 Doc #40 at 21.  She submits excerpts of the depositions of three employees who served in the department with Mitchell and who met with Curiale:  Patricia Courtney, Laura Gonzales and Laura Cuellar.  The page reflecting appearances at Cuellar's deposition reflects that Mitchell was present; the other two excerpts do not include the "appearances" page.  Without including any citations to these lengthy excerpts, Mitchell's brief contains a rambling series of defensive statements, of which the following are illustrative:

> Curiale identifies statements from Cuellar and Courtney, among others, attempting to represent that they thought Mitchell was abusive.  Both * * * clearly deny ever making such statements to Curiale and confirm that they expressly told

> him that she was not mistreating them. * * *
> The employees also confirm that Mitchell never
> required them to get food; instead, the
> employees planned that on their own as part of
> their birthday club.  Further, according to the
> employees, this is still a practice at the
> Court.  Employees even hold bridal showers at
> the Court, which Mitchell had nothing to do
> with.  The employees also reference the fact
> that all the the employees will make use of the
> kitchen on their own and cook their meals.
> Mitchell has nothing to do with that and
> certainly wasn't responsible for the decision to
> place a kitchen in the department.

Id.

Mitchell's quibbles do not amount to "specific and substantial" evidence sufficient to defeat Superior Court's motion for summary judgment.  Curiale's report largely consisted of lengthy, unattributed quotations from the numerous employees he interviewed; these could not be refuted by the three deponents Mitchell offers in opposition.  Furthermore, factual errors in the Curiale report, if any, do not equate to evidence of pretext. Finally, the depositions offered do not support Mitchell's position. Among the testimony of Laura Cuellar included in the record are statements that, for example, characterized the court department when Mitchell was there as "horrible * * * a bad working environment * * * I started applying for jobs, and I also asked to be removed from the department.  I didn't care where they put me.  I just couldn't stand it anymore."  C 04-3135, Doc #41 Ex 8 at 52-58.

A document submitted by Tolentino in opposition to Superior Court's motion against her further undermines Mitchell's contention that the reasons given for terminating her were pretextual:  a memorandum written by John A Wee, former Court Services Supervisor for the Northern Branch, dated October 10, 1995.

United States District Court
For the Northern District of California

C 04-3301 Doc #37 Ex 1.  Addressed to then-Deputy Court Executive Officer John Fitton, the memorandum, written a few months after Wee's transfer to the Northern Branch purported to contain "an overview of the personnel issues at the Northern Branch."  Wee next set forth a list of issues he was informed of even before transferring to the Northern Branch.  The list, which included low morale, infighting, communication problems and conflicts between groups, only included one entry that named a specific individual. That individual was Mitchell:

> Personnel problems existed between staff in
> the Criminal division and Criminal Supervisor
> (One in particular Yolanda Mitchell).

Id at 1.  The memorandum ran to four and one-half single-spaced pages and touched on a broad array of issues, but nearly two full pages were devoted to Wee's efforts over a period of months to resolve a conflict between Mitchell and Imelda Arbizu, Criminal Division Lead Municipal Court Clerk.  Id at 3-5.  Wee's detailed analysis of the situation supported Mitchell over Arbizu, but concluded as follows:

> Yolanda who historically has been known to be a
> trouble maker because she is outspoken, direct
> and aggressive in her manners, has been pictured
> as the instigator of negativity and ill will.
> * * * Yolanda has relied so heavily on her
> survival instincts that, she portrays herself as
> a wounded beast fighting for her own existence
> in the environment.  The Northern branch has a
> lot of wounds that need to heal and a lot of
> people that need to feel like they belong.

Id at 5.  Although Wee's memorandum was sympathetic to Mitchell, it clearly documents that Mitchell had a history of interpersonal problems in the workplace that were known to Superior Court's management years before the events at issue in the instant actions.

27

United States District Court

For the Northern District of California

It therefore buttresses Superior Court's case that Mitchell was terminated as part of Superior Court's effort to deal with management problems in the Northern Branch and not because of Mitchell's race and/or national origin.

Superior Court wishes to invoke the "same actor" inference based on Peggy Thompson's declaration that she knew Mitchell was African-American and nonetheless, in her capacity as Court Executive Officer, gave "final approval" to Mitchell's promotion to supervisor in 1990.  04-3135 Doc #35, Att #6.  Mitchell counters that she was interviewed by her manager, Dalia Salizar, who "recommended Mitchell for the position."  04-3135 Doc #40 at 23:9-10.  This statement is not inconsistent with Thompson's and therefore does not effectively refute it; Thompson's approval presumably was required for Salizar's recommendation to be carried out and Mitchell has not even attempted to establish otherwise.

The court's hesitation in invoking the same-actor inference lies in the fact that, as currently articulated by the Ninth Circuit, too much time elapsed between the 1990 promotion and the 2003 termination.  In <u>Bradley v Harcourt, Brace & Co</u>, the inference was held to arise in a case in which the same actor was responsible for both a favorable and an adverse action involving the same employee "within a short period of time."  104 F3d at 270-71. More recently, the Ninth Circuit examined the "short period of time" requirement and held that the inference could arise after a three-year lapse of time, noting that the "length of time would be significant only had [plaintiff] proffered evidence suggesting that [the employer] developed a bias against non-Norwegians during that period; but he did not."  <u>Coghlan</u>, 413 F3d at 1097.  The <u>Coghlan</u>

United States District Court

For the Northern District of California

opinion included citations to cases in other circuits applying the inference in cases involving one and three-year lapses of time. Here the court is asked to extend the inference to a thirteen-year lapse of time.

While the court agrees with the <u>Coghlan</u> opinion's logic that evidence that a particular actor has developed a bias during the interval should be regarded as more relevant than the length of that interval in defeating the same-actor inference, this court is not prepared to rest its decision on a legal theory that the Ninth Circuit has not endorsed for these facts —— that is, a lapse of thirteen years between favorable and adverse employment actions involving Mitchell.

The same-actor inference might be logically helpful, but is not necessary for Superior Court to prevail on the discrimination claim on summary judgment. As the court has already noted, Mitchell has neither established a prima facie case nor introduced "specific and substantial" evidence that Superior Court's stated reason for terminating her is pretextual. Superior Court is therefore entitled to summary judgment on Mitchell's Title VII discrimination claim.


**B**

Mitchell's complaint sets forth two separate retaliation theories, described in the heading as "RETALIATION UNDER TITLE VII (and for Union Activities)." Regarding the Title VII claim, Mitchell's complaint asserts that she

> engaged in protected activities by challenging
> discriminatory hiring practices of defendant by
> the Superior Court [sic]. As a result of
> protected activities, San Mateo the County
> Superior Court [sic] retaliated by fabricating

United States District Court

For the Northern District of California

> charges that would and did support termination.
> But for protecting Warren's rights and
> challenging discriminatory hiring practices,
> plaintiff would not have been terminated. * * *
> Plaintiff has been subject to unlawful
> retaliation * * * because of her complaints and
> because she advocated for fair treatment of
> African Americans and other minorities.

Complaint ¶¶ 21-24.

Regarding the union-activity theory, she alleges that her termination was "in part retaliation for participating in union activities in violation activities [sic] of Labor Code §§ 922-23 * * *." Complaint ¶ 25. Superior Court is entitled to summary judgment on both claims.

1

Superior Court argues that, lacking direct evidence of retaliatory motive, Mitchell must rely on circumstantial evidence to establish her prima facie case of retaliation in violation of Title VII. Superior Court argues, however, that Mitchell cannot establish the causation prong of her prima facie case because there was "a nine-month lapse," that is, too little temporal proximity between Mitchell's May 2003 complaints about the hiring process and her February 2004 termination to support an inference of retaliatory motive. The court finds this reasoning less than fully convincing.

The events that Mitchell contends resulted in retaliatory adverse employment action against her by Superior Court took place in May of 2003. Mitchell argues that "she was immediately subjected to the intent to dismiss — a suspension in her personnel file — following her complaints of the recruitment of Marvin Warren [sic], and that suspension (as a past disciplinary action) was directly \\

United States District Court
For the Northern District of California

cited as a basis for the termination."  C 04-3135 Doc #40 at 24.
Moreover, she adds,

> only two months later, in August, 2003, she is
> summarily suspended from work; she is
> indefinitely sent home, without assignments, and
> without even being apprised of the basis of
> charges against her, pending the investigation.
> The investigation, along with Thompson and
> Catalano's own personal assessments of Mitchell,
> lead [sic] directly to her termination.  The
> evidence clearly shows a direct link of adverse
> acts that followed her reports of discrimination
> and that led, in fact, to her termination.

Id.

        Contrary to Mitchell's assertion, there is no evidence in
the record that Mitchell was <u>immediately</u> subjected to any form of
discipline.  Rather, there is evidence that Superior Court
investigated Mitchell's conduct with considerable care before taking
disciplinary action against her.  Moreover, the disciplinary action
selected was a ten-day suspension on paper —— that is, an entry in
Mitchell's personnel records —— that was not intended to result in a
loss of pay or work responsibilities and was, in any event, not
carried out.  The notice of intent to suspend was not mailed until
August 4, 2003, more than two months after Mitchell complained to
management about the recruitment process.  Thompson Depo Ex 9, C 04-
3135 Doc #35 Att #1 Ex B.  Mitchell admits, furthermore, that
"Thompson assigned Schino to investigate * * * Mitchell's
'performance issues related to recruitment.' * * * Notably, * * *
Mitchell's complaints about the improprieties in the recruitment was
[sic] not the subject of the investigation, but rather '[Mitchell's]
breaking confidentiality of the recruitment process.'" C 04-3135 Doc
#40 at 5:20-24.  The record thus establishes that the adverse action
taken against Mitchell stemming from the recruitment process took

United States District Court

For the Northern District of California

place months after Mitchell's complaints and did not concern those complaints.

Another flaw in Mitchell's prima facie case of retaliation is that the documentary record before the court establishes that Mitchell's primary complaint with the recruitment process initially was her sense of being excluded and/or her frustration that the candidate she favored had not fared well in the process; only later, when she filed her DFEH charge, did she allege (1) that she had complained that an applicant had not been hired because of race discrimination and (2) that she herself had suffered race discrimination in connection with the matter.  Mitchell Decl ¶ 5 and Ex C, C 04-3135 Doc #42.  The other evidence before the court does not support these statements; moreover, the DFEH charge and other self-serving, retrospective statements by Mitchell purporting to establish a basis for a retaliation charge do not suffice to give rise to an issue of material fact sufficient to defeat Superior Court's motion.

On the other hand, Superior Court's argument that the only discipline that matters for purposes of the retaliation analysis was Mitchell's firing in February 2004 is, in the court's view, overly technical.  According to undisputed evidence in the record, Mitchell was assigned to work at home at some point during the Curiale investigation.  The Schino investigation and ensuing notice of intent to suspend overlapped these events to some degree and cannot simply be ignored.

The parties offer two contrasting theories.  Mitchell presents the sequence of events from her complaints in May 2003 to her firing in February 2004 as links in an unbroken causal chain.

**United States District Court**

For the Northern District of California

Superior Court presents the August 2003 disciplinary action against Mitchell and her 2004 termination as entirely unrelated and the work-at-home order to Mitchell in the fall of 2003 as irrelevant to the legal issues on this motion.  The burden, of course, remains on Mitchell to present a prima facie case of retaliation.  The prima facie case is doubtful because: (1) the proffered circumstantial evidence of causation is unconvincing due to lapses of time; (2) Mitchell's evidence that she "opposed" a prohibited hiring practice (race and age discrimination) is unconvincing because the evidence suggests that these theories were not central to her complaints about the recruitment process in which Warren was not hired and may well have been an afterthought; and (3) the intervening events of the Faalau hearing and management's response to Faalau's allegations against Mitchell interrupted the chain of events and threw a monkey wrench into Mitchell's causal-chain theory.

It is not necessary, however, for Superior Court to poke holes in Mitchell's prima facie case in order to prevail on summary judgment; Superior Court has presented legitimate, non-retaliatory reasons for both the August 2003 disciplinary action and the February 2004 termination of Mitchell.  Mitchell has failed to adduce evidence, as she must to defeat Superior Court's summary judgment motion, that Superior Court's reasons for the adverse employment actions against her were pretextual.  As stated in part II, supra, the Curiale report contains an abundance of legitimate reasons for terminating Mitchell's employment, none of which have anything to do with Mitchell's complaints about alleged bias in the recruitment process for deputy clerks.  Mitchell has been unable to offer any direct or circumstantial evidence that the conclusions of

33

the Curiale report were a mere pretext for terminating her. Accordingly, her Title VII retaliation claim cannot withstand Superior Court's summary judgment motion.

2

Superior Court contends that Mitchell's complaint of retaliation arising from union activities is subject to the exclusive jurisdiction of the Public Employment Relations Board (PERB) pursuant to Government Code section 71630 <u>et seq</u>, which provides in pertinent part as follows:

> A complaint alleging any violation of this article or of any rules and regulations adopted by a trial court pursuant to Section 71636 shall be processed as an unfair labor practice charge by the board. The initial determination as to whether the charge of unfair practice is justified and, if so, the appropriate remedy necessary to effectuate the purposes of this article, shall be a matter within the exclusive jurisdiction of the board.

Cal Gov't Code § 71639.1(c).

First, it appears that this claim, if viable, arises solely under state law and would require the court to exercise supplemental jurisdiction if Mitchell had a viable federal claim, which she does not.

Second, Mitchell has submitted no viable opposition to Superior Court's motion to dismiss this claim.  She argues that because she has brought suit under Title VII, the California Government Code sections in question are "pre-empted," citing the Supremacy Clause of the United States Constitution.  04-3135 Doc #40 at 24.  Superior Court correctly counters that Mitchell's claims of retaliation based on union activity are not within the purview of

\\

34

United States District Court

For the Northern District of California

United States District Court

For the Northern District of California

Title VII, whose scope is specifically delineated in the statute and is the subject of an extensive jurisprudence.

The court agrees with Superior Court that Mitchell's retaliation claim based on union activity is not cognizable by this court.

### C

Mitchell's response to Superior Court's summary judgment motion on her IIED claim fares no better.  Citing no authority, she asserts that "discrimination and retaliation constitute the outrageous conduct element of the [IIED] claims."  Id at 25. Superior Court properly cites <u>Janken v GM Hughes Electronics</u>, 46 Cal App 4th 55, 80 (1996), for the proposition that

> [m]anaging personnel is not outrageous conduct
> beyond the bounds of human decency, but rather
> conduct essential to the welfare and prosperity
> of society. * * * If personnel management
> decisions are improperly motivated, the remedy
> is a suit against the employer for
> discrimination.

No outrageous conduct is alleged in this case.  Superior Court is entitled to summary judgment as to the IIED cause of action.

### D

As for Mitchell's defamation claim, Superior Court cites Mitchell's own admissions during her deposition that the allegedly false statements on which she rests her claim (the February 19, 2004 letter of termination and the Curiale report) were not published to anyone outside Superior Court.  C 04-3135 Doc #35 at 19.  Superior Court further argues that these writings were privileged communications within the meaning of Civil Code § 47(c).

United States District Court

For the Northern District of California

When faced with cogent arguments and supporting evidence in favor of summary judgment against her claim, Mitchell was required to produce admissible evidence showing that there is a genuine issue of material fact for trial.  <u>Nissan Fire & Marine Insurance Co</u>, 210 F3d at 1102.  Mitchell, however, has not bothered to offer any opposition to Superior Court's motion on the defamation claim whatsoever:  her brief does not mention the claim.  Superior Court is therefore entitled to summary judgment.

V

A

Tolentino's complaint alleges that the true reason why Superior Court terminated her employment was because of her national origin, Filipino.  Complaint ¶¶ 21-27.  Tolentino, however, has satisfied only prongs one and three of the prima facie case, but not the second and fourth prongs.

The record contains compelling evidence that Tolentino's performance as supervisor was not satisfactory.  Tolentino counters that she received many positive performance evaluations and commendations over the course of her employment with Superior Court.  C 04-3301 Doc #35 at 2:6-10, 13:20-26 and evidence cited therein.  The Curiale investigation and report essentially revealed that Tolentino was not functioning as an effective supervisor.  Curiale described Tolentino as "docile," "more approachable" than Mitchell, but "by acquiescence, * * * as responsible for the low morale and employee turnover in the department as * * * Mitchell."  C 04-3301 #32 Att 1 Ex C Ex 2 at 3-4.  Tolentino concedes that "employee relations in the Northern Criminal Division had been problematic for

36

**United States District Court**

For the Northern District of California

many years," but seems to contend that this fact —— which Superior Court does not dispute —— somehow invalidated the Curiale investigation and report as a basis for terminating her employment. E g, C 04-3301 Doc #35 at 1.  Rather, the Curiale investigation confirmed previous reports that, in 2003, employees in the department were not being treated well and the department was mismanaged.  Tolentino has pointed out that the problems were long-standing and that she was not wholly responsible for them; she has not, however, effectively disputed the conclusions of the Curiale report.

As regards the fourth prong, Tolentino has failed to adduce evidence suggesting that the adverse action against her was motivated by discriminatory intent.  She has failed to introduce, as she must in response to Superior Court's summary judgment motion, admissible direct or circumstantial evidence of discriminatory motive on the part of Superior Court.

The bulk of Tolentino's opposition to Superior Court's motion on her discrimination claim (and almost one-third of the entire brief) is devoted to a detailed critique of Catalano's December 19, 2003 notice-of-intent-to-terminate letter.  Asserting that "each of Defendant's proffered reasons for terminating Plaintiff is unworthy of credence," id at 14, Tolentino's brief contains page after page of argument disputing the factual statements contained in Catalano's letter.  At least some of these arguments distort the evidence in the record to a degree that approaches dishonesty.  For example, Tolentino attempts to dispute the Catalano letter's assertion that she "[k]new that employees regularly went to Costco or the grocery store on Court time to

United States District Court

For the Northern District of California

purchase food for meals or snacks and cooked and prepared food on County time" and that she "signed timecards attesting that employees were working during a time when they were in fact shopping or cooking" by arguing that she did not instruct personnel to do such shopping and that there was a "longstanding tradition of * * * employees cooking and shopping during the workday."  Id at 15.  Both points are irrelevant to the point raised in the Catalano letter. Worse, she goes on to assert that "Court Executive Officer Peggy Thompson admitted at deposition that she regularly sent employees out to shop for Court functions on County time, even though such tasks were not part of the employees' job descriptions."  Id.  This misleading statement distorts the evidence:  Thompson testified only that employees were allowed to shop during their work time when preparing for a court-sponsored employee appreciation picnic.  C 04-3301 Doc #36 Ex F at 127.  The Curiale report's findings focused on shopping and cooking that was <u>not</u> for court-sponsored events and contained direct admissions by Tolentino that she had allowed people to shop for food on court time and that she knew this was wrong.  C 04-3301 Doc # 32 Att 1 Ex C Ex 2 at 5.

Furthermore, as Superior Court correctly points out, Tolentino's lengthy critique of the Catalano letter largely misses the mark because that letter was followed by a pre-termination hearing in late January and was effectively superseded by the final termination letter dated February 4, 2004 from Thompson, which documented the matters Tolentino raised at that hearing.  Tolentino has not met her burden of adducing evidence that the non-discriminatory reasons given by Superior Court are factually untrue. See <u>Reeves</u>, 530 US at 148.

38

**United States District Court**
For the Northern District of California

1     Finally, no amount of criticism and nit-picking of

2 Superior Court's factual basis and/or process for terminating her

3 employment can alter the fact that Tolentino's prima facie case is

4 deficient.  Superior Court is entitled to summary judgment on

5 Tolentino's discrimination claim.

6

7                              B

8     Tolentino's retaliation claim rests on an allegation that

9 she "supported" Mitchell's "protest of retaliatory hiring

10 practices."  Complaint ¶ 15, C 04-3301 Doc #1.  Superior Court

11 contends that Tolentino has failed to make out a prima facie case

12 because she has adduced no evidence that she engaged in protected

13 activity as required by Title VII or that Superior Court knew of the

14 alleged activity, whether or not it could be deemed "protected."

15     Tolentino's efforts to establish protected activity of

16 which Superior Court was aware are muddled and ultimately

17 ineffectual.  Her complaint alleges that (1) she "supported co-

18 supervisor [Mitchell's] protest of discriminatory hiring practices,"

19 04-3301 Doc #1 ¶ 15, and (2) "but for her support of Mitchell's

20 protest of discriminatory practices and Defendant's refusal to hire

21 and African American male, she would not have been investigated and

22 subsequently terminated," id ¶ 17.  Yet at her deposition, when

23 asked whether she had ever complained to anyone about the fact that

24 Warren was not hired, Tolentino replied "no."  C 04-3301 Doc #41 Att

25 1 Ex A at 91:2-5.  In her opposition, Tolentino points to deposition

26 testimony in which Carranza remembered Mitchell and Tolentino being

27 "pretty persistent that they wanted to hire [Warren]," Carranza Depo

28 at 70 (C 04-3301 Doc #36 Ex A), and that they complained in some

United States District Court
For the Northern District of California

fashion about the way the recruitment process was handled.  C 04-3301 Doc #35, evidence cited at 22:5.  This kind of evidence, however, does not establish protected activity.  Tolentino does not contend that she complained to Superior Court that race discrimination had been a factor in the hiring process.  The mere fact that Warren was an African-American applicant does not give rise to an inference that Mitchell's and Tolentino's disappointment that he was not hired had anything to do with his race or race discrimination.  This evidence simply does not establish protected activity under Title VII.

Next, Tolentino contends that her conversations with the various individuals who were conducting investigations during the summer of 2003 —— Gail Schino, San Mateo County EEO Manager Mary Kabakov and EEOC investigator Scott Doughtie —— were "protected activity" for Title VII retaliation purposes, citing Yartzoff v Thomas, 809 F2d 1371, 1376 (9th Cir 1987).  C 04-3301 Doc #35 at 22.  Superior Court characterizes this contention as "an eleventh-hour effort to demonstrate that [Tolentino] engaged in protected activity," C 04-3301 Doc #41 at 7:1.  While Yartzoff does characterize as protected activity "filing Title VII grievances beginning in May 1979 and [] cooperating in investigations," 809 F2d at 1375-76, the factual context makes clear that the investigations at issue concerned Yartzoff's own complaints; moreover, the record in that case contained evidence that "Yartzoff's supervisors were aware of his Title VII complaints and of his participation in administrative investigations."  Id at 1376.  Tolentino's deposition testimony demonstrates, moreover, that she was confused about the various investigations, remembered little or nothing about her

United States District Court

For the Northern District of California

conversations with the investigators and did not know whether they had related anything she said to them to Superior Court.  C 04-3301 Doc #41 Att A, Ex A at 91, 208-10.  In summary, Tolentino has offered insufficient legal and factual support for the notion that her alleged cooperation with investigators constituted protected activity for purposes of establishing a prima facie case of retaliation under Title VII.

Superior Court is entitled to summary judgment on Tolentino's retaliation claim.


C

Tolentino's opposition does not mention her claim for IIED, on which Superior Court has moved for summary judgment on the same grounds as in the Mitchell case (see part IV.C supra).  Given that it is the non-moving party's obligation under Rule 56(e) to produce evidence of a genuine issue of material fact, this claim, which plainly lacks merit on the evidentiary record before the court, may therefore be deemed abandoned.


D

Superior Court moves for summary judgment on Tolentino's defamation claim on the grounds that Superior Court's communications pertaining to Tolentino's termination contained no false statements, were privileged under California Civil Code § 47(c) and were not published to anyone.  Superior Court offers excerpts from Tolentino's deposition in which she is unable to offer any specifics in support of her defamation claim.  C 04-3301 Doc # 32 Att 1, Ex A at 229-31.

41

**United States District Court**
For the Northern District of California

1      In opposition to Superior Court's motion, Tolentino

2 asserts that it is Superior Court's burden to assert and to provide

3 evidentiary support for the privilege codified in Civil Code §

4 47(c).  She also asserts that two alleged recipients of the notice-

5 of-intent-to-terminate letter and the termination letter, Mary Welch

6 and Casey Echarte (both carbon-copy recipients of Catalano's letter

7 to Tolentino) might not have been encompassed within the § 47(c)

8 privilege.

9      In reply, Superior Court submits: (1) an excerpt of the

10 Catalano deposition identifying Casey Echarte as "the analyst in

11 Employee and Public Services and the Employee Relations Department

12 * * * at the courts," C 04-3301 Doc # 41, Att 1 Ex C; (2) an excerpt

13 of the deposition of Nicole McKay more fully explaining the role of

14 Echerte and her office, the county Labor and Employee Relations

15 Division, in the Curiale investigation and report and the ensuing

16 personnel actions, id Ex D; and (3) an excerpt of the Thompson

17 deposition identifying Mary Welch as the director of Employee and

18 Public Services for the county.  Id Ex B.  Tolentino did not seek

19 leave to file a surreply or otherwise challenge the authenticity or

20 relevance of this evidence.  It is therefore deemed established that

21 both of the individuals to whom Tolentino claimed Superior Court

22 "published" her personnel-related letters were county employees with

23 direct responsibility for Superior Court's personnel management.

24 These individuals and the communications in question fall squarely

25 within the scope of Civil Code § 47(c)'s privilege.  Kakludis, 806 F

26 at 872 (N D Cal 1992).

27      It is unnecessary to address any other issue relating to

28 Tolentino's defamation claim, such as the truth or falsity of the

**United States District Court**
For the Northern District of California

challenged communications.  Superior Court is entitled to summary
judgment on the ground of privilege alone.

VI

Superior Court, like any other employer, public or
private, was entitled to take active steps to resolve the widely-
acknowledged, serious management problems in one of its divisions by
means of personnel changes —— up to and including the termination of
ineffective managers.  This is the story that the evidentiary record
on these motions tells about the job performance of Yolanda Mitchell
and Irma Tolentino.  Superior Court's evidence of legitimate
personnel management activity is extraordinarily strong.  Neither
plaintiff has adduced evidence sufficient to establish a prima facie
case of discrimination or retaliation and/or to avoid summary
judgment on each of her claims.  Given that much of Superior Court's
evidence was already in plaintiffs' hands before these lawsuits were
filed and that the discovery process added little to support
plaintiffs' view of these terminations, this may be an appropriate
case for an award of fees and/or costs under 42 USC § 2000e-5(k),
should Superior Court be inclined to make such a motion.  See also
Christiansburg Garment Co v EEOC, 434 US 412 (1977).

\\
\\
\\
\\
\\
\\
\\

43

1             The clerk is directed to enter judgment in favor of

2 defendant Superior Court and against plaintiffs in both of these

3 consolidated matters and to close the file.

4

5             IT IS SO ORDERED.

6

7 _____

8 VAUGHN R WALKER
United States District Chief Judge